In July, 1921, the Hudson Lumber Company, a Michigan corporation, through its directors, filed a petition for dissolution. About 90 days later three permanent receivers were appointed. The matter continued in the court until June, 1929, when the so-called second and third accounts of the receivers were allowed subject to exceptions being filed within a time limited. Appellants herein, being creditors, filed exceptions to the accounts. After a prolonged hearing in court, the receivers' accounts were modified and allowed. The objecting creditors have appealed. The issue is solely one of fact.
The record is unnecessarily voluminous, and much of the detail must be omitted in our recital of the facts. Appellants charge the receivers with bad faith in selling for less than its alleged market value a contract interest in 17 acres of land on Warren avenue in Detroit. The claim asserted is that this transaction was a fraud upon the creditors, and that it diminished the corporation's assets by upwards of $90,000.
At the time of filing the petition for dissolution, William R. Hudson, Benjamin F. Hudson, and Norman W. Fox were the directors of the Hudson Lumber Company. They owned all of its stock. The corporation was organized in 1913 for the purpose of carrying on a retail lumber business. For a number of years it prospered in a rather remarkable degree. It was incident to developing its third yard that the company, in November, 1919, entered into a contract for the purchase of 20 acres of land adjacent to Warren avenue for $126,000. At the time *Page 178 
the receivers were appointed, $108,000 remained unpaid on the contract price. The receivers later planned a sale to Scranton Trevor of three acres on which the Hudson Lumber Company had developed a lumber yard. This sale, if completed, would result in reducing the unpaid portion of the contract price to substantially $62,000. But it could not be consummated without the approval of the vendors in the underlying land contract, who were then insisting upon some satisfactory arrangement also being made as to the balance of this contract, which was badly in default. The land was located rather far out and in an undeveloped locality. It was not readily marketable. At the time it was purchased, the Hudson company was doing a gross business of nearly a million dollars per year. In the following year (1920), as a witness testified: "The lumber business broke and conditions were in horrible shape." An unfortunate combination of circumstances, including the overstocking of its yards, placed the Hudson company in a badly embarrassed position financially.
Various efforts to obtain financial relief were made, but without success. Incident to this activity, Benjamin F. Hudson, who was the financial man of the corporation, worked out a plan with the Standard Mortgage Investment Company by which it was expected financial assistance would be given to the Hudson company which would relieve it from its embarrassed condition. The Standard company was supposed to have large financial resources. Without reciting details, the plan contemplated was that the three directors of the Hudson Lumber Company purchase a controlling interest in the common stock of the Standard Mortgage Investment Company, and by so doing it was expected the Hudson company *Page 179 
would be able to meet its obligations with funds to be obtained through the Standard company. Incident to their stock purchase, which resulted in an indebtedness of $280,000, these three directors pledged to the Standard company all their holdings in the Hudson company. About a year after the Hudson brothers and their brother-in-law, Mr. Fox, obtained the controlling interest in the Standard company (June, 1921), the vendee's interest of the Hudson company in 17 acres of the Warren avenue land contract was transferred to the Standard company for substantially the same amount as was unpaid on the purchase price. This was accomplished by canceling the original contract and executing a new contract in which the Standard company was vendee. The details were arranged agreeably to the vendors in the contract, who thereupon consented to the above-mentioned sale of the three acres to Scranton Trevor and also withdrew their claims against the receivership. Upon proper petition by the receivers, the transaction was approved by the court. Within approximately a year following the transfer to the Standard company, two sales of parcels from the 17 acres, one of four acres and another of three acres, were consummated. These two parcels sold for an amount nearly equal to the unpaid portion of the contract price of the whole 17 acres. In July, 1926, about four years after the Standard company took over the contract, it sold the remaining 10 acres for substantially $100,000. As noted above, the Hudson company directors had become heavily obligated to the Standard company incident to their purchase of its stock, some of which was purchased from individuals and some from the treasury. Some time subsequent to their purchase of the stock in the Standard company, it seems to *Page 180 
have been arranged that any profit derived by that company incident to the resale of the 17 acres should be credited upon the indebtedness of the Hudson brothers and their brother-in-law, Mr. Fox, to the company. This arrangement was confirmed at a meeting of the board of directors of the Standard company December 31, 1925. Appellants contend that this understanding was a part of the original transaction by which the receivers transferred to the Standard company the 17-acre land contract; but appellees assert that it was a subsequent arrangement by means of which the Hudsons were induced to turn over additional property to the Standard company, or perhaps to improve the appearance of the books of account of the Standard company. The record on the point is not at all satisfactory, but we are unable to find that it sustains appellants' contention. In any event, the purchase of the interest in the Standard company by these three men finally proved to be extremely disastrous, resulting in the Hudsons losing everything they had, including their homesteads.
It should be noted that along with Mr. William R. Hudson, one of the other permanent receivers appointed by the court, Mr. Ivo S. Faurote, was a representative of the First National Bank, which was the largest creditor of the Hudson company, and the other receiver, Mr. Seymour S. Rutherford, was a Detroit wholesale lumberman and also a large creditor of the Hudson company. The complaining creditors seek to hold the receivers personally liable on the ground that they acted in bad faith in disposing of the Hudson company's interest in the 17 acres in the manner above outlined. On the other hand, the receivers claim that the whole transaction was consummated in the utmost good faith. They *Page 181 
point out that the original claim of the vendors under this land contract, together with another obligation held by them against the Hudson company in excess of $10,000, constituted more than 40 per cent. of the claims filed in the receivership. Because of this situation, when the first 10 per cent. liquidation dividend was paid to the creditors of the Hudson company, the vendors on this land contract received $10,928.10. The receivers felt that this situation worked an injustice to the Hudson company and its other creditors. Comparatively early in the proceeding one of the receivers referred to this land contract as the company's "white elephant." Confronted with this situation, the receivers petitioned the court for leave to dispose of the Hudson company's interest in the land contract. Permission was given, and the subsequent real estate transactions from time to time were submitted to the court and approved.
While there are many facts and circumstances having a bearing upon the question of the good faith or bad faith with which the receivers acted, a careful consideration of the record convinces us that good faith is established. If the transaction consummated with the Standard company was a fraud upon or disadvantage to the complaining creditors, it was likewise a fraud upon and a disadvantage to the First National Bank, in whose behalf Mr. Faurote was interested, and also of the rights of the other receiver, Mr. Rutherford, who was a large creditor of the Hudson company. Viewed in retrospect, it may now be said that the receivers erred in judgment by disposing of the Hudson company's interest in the 17-acre parcel. But good faith or bad faith on their part must be determined in the light of the situation then confronting them. The Hudson company *Page 182 
was badly in default in its payments on the contract. The vendors served notice on the receivers of intention to take advantage of an acceleration clause, in which event the full purchase price became due and payable forthwith. Even prior to the receivership, creditors of the Hudson company were threatening bankruptcy proceedings. As noted above, before the sale by the receivers of any portion of the original 20 acres, the claims filed by the vendors represented more than 40 per cent. of the Hudson company's liabilities. That the receivers were in good faith attempting to relieve this situation is quite conclusively indicated by the fact that a further 30 per cent. liquidation dividend was paid to the Hudson company creditors within a few days after the land contract was disposed of and the vendors had waived their right to participate in future dividends. There is direct conflict in the testimony as to the market value of this property; but unquestionably it varied much from time to time as local conditions changed. The record discloses that the receivers made every reasonable effort to make an advantageous disposition of the property. It may also be noted that many, if not all, of the now complaining creditors had notice through the attorney who then represented them of the court proceeding taken incident to the sale. The record does not even. raise a suspicion as to the good faith with which Mr. Faurote and Mr. Rutherford acted in this matter. As to Mr. William R. Hudson, we think he too acted in good faith and in the hope, ill-founded though it was, that the Hudson company's creditors would be paid in full, and that through assistance to be obtained from the Standard Mortgage Investment Company something could be salvaged from the lumber company wreck. The true reason *Page 183 
for consummating the sale of the 17 acres appears in the order of the circuit judge made June 28, 1922, which reads:
"And it appearing to the court now here from said petition that the granting of the authority prayed for will lessen the indebtedness of the estate and facilitate the liquidation thereof, and that the same is necessary to effectuate the sale heretofore authorized from the receivers to Scranton Trevor by previous order of this court entered April 13, 1922," * * *
The trial judge in disposing of the matter now under review said:
"It is my conclusion that the receivers acted in good faith in connection with the Theisen transaction (Warren avenue contract). * * * There had been and was still a lull in the real estate market; there was no demand for industrial sites. The property had been purchased from the Theisens at a high price. While in the light of subsequent developments a better price could have possibly been obtained for the property later, it appears that the receivers did everything in their power to make a sale of this property before the transaction with the Standard Mortgage Investment Company, but without success. The objecting creditors were advised through their then counsel of the various steps taken by the receivers and made no objection until the report was filed."
We think the trial judge was clearly justified in overruling the contention of the objecting creditors. His order as entered in the circuit court in chancery is affirmed, with costs to appellees.
CLARK, C.J., and McDONALD, POTTER, SHARPE, FEAD, WIEST, and BUTZEL, JJ., concurred. *Page 184